IN THE SUPREME COURT OF NORTH CAROLINA

No. 319A17

Filed 8 June 2018

STATE OF NORTH CAROLINA

v.

AHMAD JAMIL NICHOLSON

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 805 S.E.2d 348 (2017), finding prejudicial error after appeal from a judgment entered on 13 May 2016 by Judge John O. Craig III in Superior Court, Forsyth County, and granting defendant a new trial. Heard in the Supreme Court on 13 March 2018.

> *Joshua H. Stein, Attorney General, by John R. Green, Jr., Special Deputy Attorney General, for the State-appellant.*
>
> *Narendra K. Ghosh for defendant-appellee.*

HUDSON, Justice.

Here we consider whether a police officer's decision to briefly detain Defendant Ahmad Jamil Nicholson for questioning was supported by a reasonable suspicion of criminal activity. Because we conclude that it was, we reverse the decision of the Court of Appeals holding otherwise and reinstate defendant's conviction.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

While on patrol at around 4:00 a.m. on 23 December 2015, Lieutenant Damien Marotz of the Kernersville Police Department noticed a car parked on West Mountain Street in a turn lane next to a gas station. The car had its headlights on but no turn signal blinking. As Lt. Marotz pulled his marked patrol vehicle up next to the car, he saw two men inside, one in the driver's seat and the other—later identified as defendant—in the seat directly behind the driver. The windows were down despite misting rain and a temperature in the 40s. As Lt. Marotz pulled alongside, he saw defendant pulling down a hood or "toboggan-style mask of some kind . . . with the holes in the eyes." Defendant pulled it down to the bridge of his nose but then pushed it back up when he saw Lt. Marotz.

Lt. Marotz asked the two men whether everything was okay, and they responded that it was. The driver, Quentin Chavis, explained that the man in the back seat was his brother and they had been in an argument. Chavis said that the argument was over and that everything was okay; defendant agreed, saying, "Yes, Officer, everything's fine." Sensing that something was not quite right, however, Lt. Marotz again asked the pair whether they were okay, and they nodded to indicate that they were. Then the driver moved his hand near his neck, "scratching or doing something with his hand," but Lt. Marotz was unsure what this gesture meant.

Still feeling that something was amiss, Lt. Marotz drove into the gas station parking lot to observe the situation. After watching as Chavis's car remained immobile in the turn lane for another half a minute, Lt. Marotz got out of his patrol

vehicle and started on foot toward the stopped car. Defendant then stepped out, and Chavis began to edge the car forward about two feet. Lt. Marotz asked Chavis, "Where are you going? Are you going to leave your brother just out here?" Chavis responded, "No. I'm just late for work. I've got to get to work." Lt. Marotz again asked whether everything was okay, and the two men said "yes," everything was fine. Although Chavis said "yes," he shook his head "no." This gesture prompted Lt. Marotz to say to defendant, "Well, your brother here in the driver's seat is shaking his head. He's telling me everything's not fine. Is everything fine or not? Is everything good?" Chavis quickly interjected, "No, Officer, everything's fine. I've just got to get to work." After Chavis again stressed that he was going to be late for his job, Lt. Marotz told him, "Okay. Go to work."

After Chavis drove away, defendant stated to Lt. Marotz, "The store's right here. Can I just walk to the store? Please sir?" to which Lt. Marotz responded, "[H]ang tight for me just a second . . . you don't have any weapons on you do you?"[1] Defendant said that he had a knife with him that he carried for self-defense, but a frisk of his person by a backup officer who had just arrived did not reveal a weapon. After additional questioning, the officers learned defendant's identity from his ID card and told him he was "free to go."

---

[1] This is the point during the interaction at which the Court of Appeals assumed, without expressly deciding, that defendant was seized for Fourth Amendment purposes. *State v. Nicholson*, ___ N.C. App. ____, ___, 805 S.E.2d 348, 356.

Later that day, Chavis reported to police that defendant, who was not actually his brother, had been in the process of robbing him when Lt. Marotz pulled up. Chavis testified at trial that defendant had flagged him down while he (Chavis) was on his way to his early morning shift at FedEx and had requested a ride to the gas station. Once in the car, defendant held a knife to Chavis's throat and demanded money. Chavis handed over his debit card just before Lt. Marotz pulled up. Police later found a steak knife in the back seat of Chavis's vehicle. During a search of defendant's residence, police discovered a knife block containing steak knives that looked identical to the one found in Chavis's car, one of which was missing.

On 14 March 2016, the Forsyth County Grand Jury indicted defendant for robbery with a dangerous weapon. On 4 May 2016, defendant moved to suppress evidence obtained as a result of his seizure by Lt. Marotz, asserting that defendant had been unlawfully detained in violation of his rights under the constitutions of the United States and North Carolina.

Defendant was tried during the criminal session of Superior Court, Forsyth County, that began on 9 May 2016 before Judge John O. Craig III. At a hearing conducted that day on defendant's motion to suppress evidence related to his seizure, Lt. Marotz was the sole witness. His testimony included the facts set forth above explaining defendant's seizure on the morning of 23 December 2015. After hearing arguments from counsel, the trial court orally denied the motion to suppress without making specific findings of fact or conclusions of law. Although the trial court

instructed the State to prepare an order containing findings of fact and conclusions of law, no such order can be found in the record.

The jury convicted defendant of common law robbery on 12 May 2016, and the trial court sentenced him to ten to twenty-one months of imprisonment, suspended for thirty-six months of supervised probation. Defendant appealed, and on 19 September 2017 the Court of Appeals issued a divided opinion in which it ordered a new trial after concluding that Lt. Marotz lacked reasonable suspicion to detain defendant for questioning and that the trial court committed prejudicial error by denying defendant's suppression motion. *State v. Nicholson*, ___ N.C. App. ____, ___, 805 S.E.2d 348, 358. The dissenting judge concluded that the trial court had properly denied the motion because Lt. Marotz did have reasonable suspicion that criminal activity was afoot when he seized defendant. *Id.* at ___, 805 S.E.2d at 358 (Murphy, J., dissenting). The State filed its appeal of right to this Court based on the dissent.

## II. ANALYSIS

The State argues that the Court of Appeals erred in concluding that the facts established at the suppression hearing fell short of demonstrating that Lt. Marotz had a reasonable, articulable suspicion of criminal activity before he stopped defendant. Generally, the standard of review in evaluating a trial court's denial of a motion to suppress is "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Jackson*, 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015) (quoting *State v. Otto*, 366 N.C.

134, 136, 726 S.E.2d 824, 827 (2012)). In evaluating a trial court's denial of a motion to suppress when the facts are not disputed and the trial court did not make specific findings of fact either orally or in writing, we infer the findings from the trial court's decision and conduct a de novo assessment of whether those findings support the ultimate legal conclusion reached by the trial court.[2] Accordingly, we consider whether the inferred factual findings arising from the uncontested evidence presented by Lt. Marotz at the suppression hearing support the trial court's conclusion that reasonable suspicion existed to justify defendant's seizure.

As a general matter, "[b]oth the United States and North Carolina Constitutions protect against unreasonable searches and seizures." *Otto*, 366 N.C. at 136, 726 S.E.2d at 827 (citing U.S. Const. amend. IV and N.C. Const. art. I, § 20). The United States Supreme Court has long held that the Fourth Amendment permits

---

[2] The statute governing motions to suppress evidence provides that the trial court "must set forth in the record [its] findings of facts and conclusions of law." N.C.G.S. § 15A-977(f) (2017). We have noted, however, that in some situations "[a] written determination setting forth the findings and conclusions is not necessary, but it is the better practice." *State v. Bartlett*, 368 N.C. 309, 312, 776 S.E.2d 672, 674 (2015) (citing *State v. Oates*, 366 N.C. 264, 268, 732 S.E.2d 571, 574 (2012)). We explained in *Bartlett* that,

> [a]lthough the statute's directive is in the imperative form, only a material conflict in the evidence—one that potentially affects the outcome of the suppression motion—must be resolved by explicit factual findings that show the basis for the trial court's ruling. When there is no conflict in the evidence, the trial court's findings can be inferred from its decision. Thus, our cases require findings of fact only when there is a material conflict in the evidence and allow the trial court to make these findings either orally or in writing.

*Id*. at 312, 776 S.E.2d at 674 (first citing *State v. Salinas*, 366 N.C. 119, 123-24, 729 S.E.2d 63, 66 (2012); then citing *State v. Ladd*, 308 N.C. 272, 278, 302 S.E.2d 164, 168 (1983); and then citing *State v. Munsey*, 342 N.C. 882, 885, 467 S.E.2d 425, 427 (1996)).

a police officer to conduct a brief investigatory stop of an individual based on reasonable suspicion that the individual is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 30-31, 88 S. Ct. 1868, 1884-85, 20 L. Ed. 2d 889, 911 (1968).

> The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." . . . The standard takes into account the totality of "the circumstances—the whole picture." Although a mere " 'hunch' " does not create reasonable suspicion, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause.

*Navarette v. California*, ___ U.S. ____, ____, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680, 686 (2014) (first quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981); then quoting *id.* at 417, 101 S. Ct. at 695, 66 L. Ed. 2d at 629; then quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909; and then quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1, 10 (1989)). As this Court has explained, "[t]he stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins*, 337 N.C. 437, 441-42, 446 S.E.2d 67, 70 (1994) (citing, *inter alia*, *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). "This same standard—reasonable suspicion—applies under the North Carolina Constitution." *Jackson*, 368 N.C. at 78, 772 S.E.2d at 849 (citing *Otto*, 366 N.C. at 136-37, 726 S.E.2d

at 827). Therefore, when a criminal defendant files a motion to suppress challenging an investigatory stop, the trial court can deny that motion only if it concludes, after considering the totality of the circumstances known to the officer, that the officer possessed reasonable suspicion to justify the challenged seizure.

The parties here do not dispute that defendant was seized when, after Chavis drove off, defendant stated to Lt. Marotz, "The store's right here. Can I just walk to the store? Please sir?" and Lt. Marotz responded, "[H]ang tight for me just a second . . . you don't have any weapons on you do you?" As the Court of Appeals did, we assume without deciding that defendant was seized at this moment. *See Terry*, 392 U.S. at 16, 88 S. Ct. at 1877, 20 L. Ed. 2d at 903 (recognizing that a seizure can occur when an officer "restrains [a person's] freedom to walk away").

Here the State contends that the facts known to Lt. Marotz, when viewed objectively and in their totality, would lead a reasonable officer to suspect that a crime had just been committed or was in progress. The State points to the following facts, among others: (1) it was 4:00 a.m.; (2) the vehicle was stopped in the road with no turn signal on; (3) there were only two people sitting in the car, one in the driver's seat and the other directly behind him in the back seat; (4) defendant appeared to be pulling some sort of toboggan or ski mask down over his face until he saw Lt. Marotz and pushed it back up; (5) when Lt. Marotz asked whether the occupants were okay, each said yes, but Chavis made a hand motion at his neck area; (6) after Lt. Marotz drove into the store parking lot and waited for an additional thirty seconds, the

vehicle still did not move or display a turn signal; (7) after defendant got out of the car, Chavis was edging forward and about to leave defendant, who he had just said was his brother, on the side of the road on a cold, wet night; (8) when Lt. Marotz again asked whether everything was okay, Chavis shook his head "no" while defendant said everything was fine; and (9) after Lt. Marotz confronted defendant with the fact that Chavis shook his head "no," Chavis quickly stated that everything was okay. All of this occurred before defendant stated that he wished to go into the store and Lt. Marotz stopped him to inquire about weapons.

We agree with the State that these circumstances established a reasonable, articulable suspicion that criminal activity was afoot. These facts strongly suggest that Chavis had been under threat from defendant, as well as the possibility that defendant was in the process of robbing Chavis. As we have recently explained,

> the reasonable suspicion standard does not require an officer actually to witness a violation of the law before making a stop. . . . *Terry* stops are conducted not only to investigate past crime but also to halt potentially ongoing crime, to thwart contemplated future crime, and . . . to protect the public from potentially dangerous activity.

*State v. Heien*, 366 N.C. 271, 279, 737 S.E.2d 351, 356-57 (2012) (citations omitted), *aff'd*, ___ U.S. ___, 35 S. Ct. 530, 190 L. Ed. 2d 475 (2014). Assessments of reasonable suspicion are often fact intensive, and courts must always view facts offered to support reasonable suspicion in their totality rather than in isolation. *See United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751, 151 L. Ed. 2d 740, 750 (2002)

("Although each of the series of acts was 'perhaps innocent in itself,' . . . taken together, they 'warranted further investigation.' " (quoting *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880-81, 20 L. Ed. 2d at 907)); *State v. Williams*, 366 N.C. 110, 117, 726 S.E.2d 161, 167 (2012) ("Viewed individually and in isolation, any of these facts might not support a reasonable suspicion of criminal activity. But viewed as a whole by a trained law enforcement officer . . . , the responses were sufficient to provoke a reasonable articulable suspicion that criminal activity was afoot . . . .").

Here, while each of the above-listed facts might not establish reasonable suspicion when viewed in isolation, when considered in their totality they could lead a reasonable officer to suspect that he had just happened upon a robbery in progress. When viewing all the facts together, innocent explanations for the events that Lt. Marotz observed seem much less likely than this scenario. If indeed these were two brothers, why would they be seated one in front of the other like a taxi or rideshare driver and customer might sit, and why would one brother leave the other on the side of the road in the middle of a cold, wet night after an argument had ended? And if everything had been resolved, why would Chavis silently shake his head "no" when asked whether everything was fine? Add to these questions defendant's suspicious behavior involving the toboggan or ski mask[3] and it is clear that reasonable suspicion

---

[3] We are not persuaded by defendant's suggestion that Lt. Marotz's uncertainty during cross-examination about whether defendant's headgear actually had eyeholes is dispositive to the present analysis. The suspicious fact—just one among other suspicious indicia—was that defendant was pulling something down over his face and abruptly pushed it back up when he saw a police officer.

existed to briefly detain defendant for questioning.[4]

We also agree with the State that the Court of Appeals majority placed undue weight on Lt. Marotz's subjective interpretation of the facts rather than focusing on how an objective, reasonable officer would have viewed them. During cross-examination at the suppression hearing, the following exchange occurred in which defendant's counsel questioned Lt. Marotz about why he stopped defendant after permitting Chavis to leave the scene:

> Q. So you were continuing to question [defendant] about an incident that you had already released one of the parties to?
>
> A. That's correct.
>
> Q. *And you, at that point, had no evidence of any criminal activity that you were able to objectively point to. Correct?*
>
> A. *No. That's why I was continuing to investigate.*

---

[4] We find the drug cases from other jurisdictions cited by defendant unpersuasive because they are not factually analogous or otherwise helpful to his case. The broader point defendant appears to make is, as the United States Court of Appeals for the Fourth Circuit put it, a

> concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity. . . . [A]n officer and the Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.

*United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). We are satisfied that the State *is* able to articulate why the set of circumstances and behaviors here was suspicious and "likely to be indicative of some more sinister activity than may appear at first glance." *Id.*

> Q. So you were looking to see if you could find anything, but you hadn't yet seen anything?
>
> A. That's correct. I wanted to make sure that both your client and also the alleged victim were safe and that nothing had happened to either one of them.

(Emphases added.) The Court of Appeals majority concluded that this exchange "confirmed [Lt. Marotz] had no evidence of any criminal activity to which he could objectively point." *Nicholson*, ___ N.C. App. at ___, 805 S.E.2d at 356 (majority opinion).

It is well established, however, that "[a]n action is 'reasonable' under the Fourth Amendment, *regardless of the individual officer's state of mind*, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650, 658 (2006) (brackets in original and first emphasis added) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168, 178 (1978) (second emphasis added)); *see also Ashcroft v. al–Kidd*, 563 U.S. 731, 736, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149, 1155-56 (2011) ("Fourth Amendment reasonableness 'is predominantly an objective inquiry.' We ask whether 'the circumstances, viewed objectively, [justify the challenged] action.' If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials." (first quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47, 121 S. Ct. 447, 457, 148 L. Ed. 2d 333, 347 (2000); then quoting *Scott*, 436 U.S. at 138, 98 S. Ct. at 1723, 56 L. Ed. 2d at 178 (bracketed language added); and

then quoting *Whren v. United States*, 517 U.S. 806, 814, 116 S. Ct. 1769, 1775, 135 L. Ed. 2d 89, 98 (1996))); *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906 ("[It] is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

We have highlighted this principle in several of our decisions. For instance, in *State v. Bone*, 354 N.C. 1, 550 S.E.2d 482 (2001), *cert. denied*, 535 U.S. 940, 122 S. Ct. 1323, 152 L. Ed. 2d 231 (2002), we considered whether an officer had probable cause to arrest a defendant despite the fact that the officer stated during the suppression hearing that he did *not* think he had probable cause to make the arrest. *Id.* at 10, 550 S.E.2d at 488. We explained that the officer's "subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or *reasonable* grounds for his actions. The search or seizure is valid when the objective facts known to the officer meet the standard required." *Id.* at 10, 550 S.E.2d at 488 (quoting *State v. Peck*, 305 N.C. 734, 741, 291 S.E.2d 637, 641-42 (1982)); *see also State v. Riggs*, 328 N.C. 213, 218-19, 400 S.E.2d 429, 432-33 (1991) (concluding that an officer's subjective belief that an informant whose tip he used to establish probable cause for a search warrant did not meet the legal definition of a "reliable" informant "does not control" given that "the defendants' rights 'are governed by the law, rather than by the officers' misunderstanding of it' " (quoting *State v. Coffey*, 65 N.C. App. 751, 758, 310 S.E.2d 123, 128 (1984))).

Accordingly, we do not consider Lt. Marotz's subjective analysis of the facts as probative of whether those facts—viewed objectively—satisfy the reasonable suspicion standard necessary to support defendant's seizure.

In a related argument, defendant contends that the Court of Appeals correctly concluded that the facts did not establish reasonable suspicion "in light of the fact Lt. Marotz already questioned both Defendant and Chavis twice and subsequently released Chavis so he could go to work after he assessed the situation and concluded '[i]t was a heated argument between two brothers.'" *Nicholson*, ___ N.C. App. at ___, 805 S.E.2d at 356. That is, defendant argues that Lt. Marotz had determined, based upon Chavis's and defendant's responses to his questions, that there was no criminal activity afoot. But again, the Court of Appeals majority and defendant focus on Lt. Marotz's subjective state of mind rather than conducting an objective inquiry. Whatever personal perspective Lt. Marotz provided on cross-examination about the stop, the facts support a reasonable inference that, rather than a recent squabble between brothers, something more sinister had been unfolding when he arrived on the scene. Moreover, a reasonable officer is not required to accept at face value statements made during an investigation, especially in light of the other suspicious circumstances present here.

As the United State States Supreme Court has observed,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and

> allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612, 616-17 (1972) (citing *Terry*, 392 U.S. at 23, 88 S. Ct. at 1881, 20 L. Ed. 2d at 907). Lt. Marotz adopted such an approach here. Rather than shrugging his shoulders when he came upon a concerning situation, he did good police work. He saw signs—some subtle, some more overt—that something was amiss, and he investigated appropriately. We will not fault the State for the officer's subjective characterizations of the facts at the suppression hearing when, as a legal matter, the undisputed facts establish reasonable suspicion necessary to justify defendant's seizure.

### III. CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Appeals and instruct that court to reinstate the judgment entered by the trial court on 13 May 2016.

REVERSED.